United States District Court
Middle District of Florida
Jacksonville Division

**ANTHONY STOKES,**

***Plaintiff,***

**v.** **NO. 3:25-CV-1172-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

***Defendant.***

---

# Order

Proceeding under 42 U.S.C. § 405(g), the plaintiff requests judicial review of a final decision by the Commissioner of Social Security. Doc. 1. The procedural history, evidence, and law are summarized in the Administrative Law Judge's (ALJ's) decision, Tr. 25–55, and the parties' briefs, Docs. 9, 11, and not fully repeated here.

## I. Law

### *A. Scope of Review*

Section 405(g) details the scope of review:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner …, with or without remanding the cause for a rehearing. The findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner … or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner …, because of failure of the

> [plaintiff] or such individual to submit proof in conformity with any regulation prescribed …, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoted authority omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019); *see also id.* at 108 (describing a case-by-case inquiry about vocational expert testimony that "defers to the presiding ALJ, who has seen the hearing up close").

### *B. Disability*

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); 20 C.F.R. § 404.1521. A claimant has the burden of providing evidence that he is disabled. 20 C.F.R. § 404.1512(a).

### *C. Residual Functional Capacity (RFC)*

A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1), (3). At the hearing level, an ALJ is responsible for assessing the RFC based on all relevant evidence. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). In assessing the RFC, an ALJ must consider both severe and non-severe impairments. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1268 (11th Cir. 2019).

### *D. Medical Opinions and Prior Administrative Medical Findings*

Regulations explain how the agency considers medical opinions and prior administrative medical findings for claims filed after March 27, 2017:

> (a) How we consider medical opinions and prior administrative medical findings. We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability … and consistency[.] We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.
>
> (b) How we articulate our consideration of medical opinions and prior administrative medical findings. We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record. Our articulation requirements are as follows:
>
>> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence

> from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.
>
> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

(c) Factors. We will consider the following factors when we consider the medical opinion(s) and prior administrative medical finding(s) in your case:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the [plaintiff]. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. ….

(ii) Frequency of examinations. ….

(iii) Purpose of the treatment relationship. ….

(iv) Extent of the treatment relationship. ….

(v) Examining relationship. ….

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the

> medical opinion or prior administrative medical finding more or less persuasive.
>
> (d) Evidence from nonmedical sources. We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section.

20 C.F.R. § 404.1520c.

## *E. Symptoms*

Regulations explain how the agency evaluates symptoms, including pain:

> (a) General. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.
>
> (b) Need for medically determinable impairment that could reasonably be expected to produce your symptoms, such as pain.

Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present. Medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. In cases decided by a State agency … , a State agency medical or psychological consultant or other medical or psychological consultant designated by the Commissioner directly participates in determining whether your medically determinable impairment(s) could reasonably be expected to produce your alleged symptoms. In the disability hearing process, a medical or psychological consultant may provide an advisory assessment to assist a disability hearing officer in determining whether your impairment(s) could reasonably be expected to produce your alleged symptoms. At the [ALJ] hearing or Appeals Council level of the administrative review process, the adjudicator(s) may ask for and consider the opinion of a medical or psychological expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms. The finding that your impairment(s) could reasonably be expected to produce your pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of your symptoms. We will develop evidence regarding the possibility of a medically determinable mental impairment when we have information to suggest that such an impairment exists, and you allege pain or other symptoms but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms.

(c) Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work—

(1) General. When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work. In evaluating the intensity and persistence of your symptoms, we consider all of

the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider the medical opinions as explained in § 404.1520c. ….

(2) Consideration of objective medical evidence. Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

(3) Consideration of other evidence. Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other

persons. … Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(4) How we determine the extent to which symptoms, such as pain, affect your capacity to perform basic work activities. In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such

> as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.
>
> (d) Consideration of symptoms in the disability determination process. We follow a set order of steps to determine whether you are disabled. If you are not doing substantial gainful activity, we consider your symptoms, such as pain, to evaluate whether you have a severe physical or mental impairment(s), and at each of the remaining steps in the process. ….
>
> (1) Need to establish a severe medically determinable impairment(s). Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, are considered in making a determination as to whether your impairment or combination of impairment(s) is severe.
>
> (2) Decision whether the Listing of Impairments is met. Some listed impairments include symptoms usually associated with those impairments as criteria. Generally, when a symptom is one of the criteria in a listing, it is only necessary that the symptom be present in combination with the other criteria. It is not necessary, unless the listing specifically states otherwise, to provide information about the intensity, persistence, or limiting effects of the symptom as long as all other findings required by the specific listing are present.
>
> (3) Decision whether the Listing of Impairments is medically equaled. If your impairment is not the same as a listed impairment, we must determine whether your impairment(s) is medically equivalent to a listed impairment. Section 404.1526 explains how we make this determination. Under § 404.1526(b), we will consider medical equivalence based on all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding. In considering whether your symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether your symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria. However, we will not substitute your allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of your impairment(s) to that of a listed impairment. If the symptoms, signs, and laboratory findings of your impairment(s) are equivalent in severity to those of a listed

> impairment, we will find you disabled. If it does not, we will consider the impact of your symptoms on your [RFC].
>
> (4) Impact of symptoms (including pain) on [RFC]. If you have a medically determinable severe physical or mental impairment(s), but your impairment(s) does not meet or equal an impairment listed in appendix 1 of this subpart, we will consider the impact of your impairment(s) and any related symptoms, including pain, on your [RFC].

20 C.F.R. § 404.1529 (internal citations omitted).

## II. Administrative Record

The plaintiff applied for disability insurance benefits, alleging that he had become disabled at the age of 46 on March 1, 2021. Tr. 336–37. He has a college education and law enforcement employment from 1998 to 2021. Tr. 398. He claimed disability from gunshot wounds, post-traumatic stress disorder (PTSD), and chronic pain syndrome. Tr. 336, 397.

At the initial determination level, state agency medical consultant Loc Kim Le, M.D., found that the plaintiff could lift, carry, or both, 20 pounds occasionally and ten pounds frequently; stand, walk, or both, for two hours during an eight-hour workday; sit for about six hours in an eight-hour workday; frequently climb ramps or stairs, stoop, kneel, crouch, and crawl; and occasionally balance and climb ladders, ropes, or scaffolds. Tr. 144–45. The claim was denied. Tr. 195–99. Gary Smith, M.D., made the same findings upon reconsideration. Tr. 153–54. The reconsideration request was denied. Tr. 206–09.

On August 18, 2023, the ALJ conducted an evidentiary hearing, Tr. 102–39, and afterward issued a decision finding that the plaintiff is not disabled, Tr. 157–88. The Appeals Council remanded the case to further

evaluate the standing and walking limitations identified by Dr. Le and Dr. Smith. Tr. 189–94.

On December 11, 2024, the ALJ conducted a second hearing, Tr. 62–98, and afterward issued a second decision, Tr. 25–55. The plaintiff provided additional evidence between the hearing and the decision, which the ALJ accepted. Tr. 26; *see* Tr. 64–65.

The ALJ found that the plaintiff was insured through December 31, 2025, and has engaged in no substantial gainful activity since March 1, 2021. Tr. 28.

The ALJ found that the plaintiff has severe impairments of arthropathies, PTSD, and gunshot wounds, and non-severe impairments of hearing loss, obesity, gastrointestinal issues, and sleep apnea. Tr. 28–29. The ALJ explained his reasoning for finding those impairments non-severe:

> The record includes a diagnosis of bilateral hearing loss. In April 2022, the [plaintiff] was evaluated. Following testing, there was evidence of slight, sensorineural hearing loss. It was opined that the [plaintiff] may have moderate auditory-based communicative deficits in certain environments. The [plaintiff] was advised to consider undergoing a hearing aid trial (Ex. 17F, pages 18-19 [Tr. 1118–19]). At the December 11, 2024, hearing, the [plaintiff] testified that he was diagnosed with approximately 53 or 56 percent bilateral hearing loss. [He] testified that he experiences tinnitus on a constant basis. [He] testified that he requires assistance from his wife due to the bilateral hearing loss.
>
> Overall, the record does not document significant issues based upon hearing loss. The [plaintiff] is able to participate in medical appointments via telehealth without issue. While [he] reported issues with tinnitus, mental status examinations document [his] appearance as normal, and [he] is described as cooperative, calm, and pleasant. [He] also exhibits normal findings concerning his speech (Ex. 30F [Tr. 3669–724]). Further, [he] is also noted to be able to

participate in telehealth appointments without issues. Given the foregoing, the [plaintiff] does not have a severe hearing loss impairment.

The [plaintiff] has been diagnosed as obese. In evaluating the obesity, the undersigned has carefully considered Social Security Ruling 19-2p regarding the functional limitations imposed either alone or in combination with another medically determinable impairments[.] There is no specific listing for obesity; however, the functional limitations caused by obesity may medically equal a listing. If the [plaintiff]'s obesity, alone or in combination with another impairment, significantly limits the physical or mental ability to perform basic work activities, we find that the impairment is severe. There is no specific weight or BMI that establishes whether obesity is severe or nonsevere. It is fact specific and therefore, terms such as morbid or extreme obesity are not determinative. It is based on the individualized assessment regarding the effect of obesity on the person's overall functioning.

In this case, the state agency medical consultants did not include obesity amongst the [plaintiff]'s severe or non-severe impairments (Ex. 1A and 3A [Tr. 140–47, 149–55]). At the August 18, 2023, hearing, the [plaintiff] testified to issues with pain and fatigue that could be, in part, attributable to obesity. However, examinations of [him] support the conclusion that the impairment does not result in more than minimal limitations. For example, in February 2023, upon examination, [he] exhibited no tenderness or deformity in his musculoskeletal system. [He] exhibited a normal range of motion and exhibited no erythema or warmth in his feet. Findings concerning his abdomen, vascular, cardiovascular and pulmonary systems were normal (Ex. 17F, pages 12–13 [Tr. 1112–13]). A March 1, 2024, entry noted that upon examination, [he] exhibited normal coordination, a supple neck, and a normal range of motion in his musculoskeletal system, with no evidence of tenderness or deformity. [His] feet exhibited no erythema or warmth. Cardiovascular and pulmonary findings were normal (Ex. 26F, pages 67–69 [Tr. 1930–32]). An April 2, 2024, entry noted that upon examination [he] exhibited a slowed gait. However, there was no significant hip pain with logroll or hip flexion with internal rotation. [He] exhibited some mild pain with a Stinchfield maneuver but was non-tender to palpitation along the lateral aspect of the greater trochanter. [He] was in no acute distress. [His] strength was normal throughout the upper and lower extremities. Vascular findings were normal, and [his] incision was

> described as well-healed. Respiratory findings were also normal (Ex. 26F, page 42 [Tr. 1905]).
>
> Given the normal examination findings, the record supports the conclusion that the [plaintiff]'s obesity does not result in exertional or postural limitations. Results documenting normal findings concerning [his] extremities supports the conclusion that the impairment does not result in stress on weight-bearing joints that would result in limitations. Examination results also support the conclusion that the condition does not result in adipose tissue in the hands and fingers that would result in manipulative limitations. Given the foregoing, the [plaintiff] does not have a severe obesity impairment.
>
> In the initial assessment, the [plaintiff] was found to have a severe disorder of the gastrointestinal system (Ex. 1A [Tr. 140–47]). However, this impairment was not included in the reconsideration assessment (Ex. 3A [Tr. 149–55]). The undersigned has considered the [plaintiff]'s complaints of abdominal pain within the context of his arthropathy impairment.
>
> At the December 11, 2024, hearing, the [plaintiff] testified that he was recently diagnosed with sleep apnea. A study revealed an overnight oximetry pattern suggestive of mild sleep disordered breathing (Ex. 26F, page 303 [Tr. 2166]). The [plaintiff] testified that he uses a CPAP machine. [He] testified that the machine has helped improve his breathing and sleeping. [He] is noted to exhibit a normal mental status following examinations, which supports the conclusion that [he] is not experiencing sleep impairment to a degree that impacts his cognitive functioning. For example, in December 2024, the [plaintiff] exhibited normal findings concerning his attention, concentration, thought process, thought content, motor activity, speech, and appearance, and was calm, cooperative and pleasant (e.g., Ex. 30F, page 55 [Tr. 3723]). Given the study results, the [plaintiff]'s response to treatment, and examination findings, the undersigned concludes that the [plaintiff] does not have a severe sleep apnea impairment.

Tr. 28–29. The ALJ stated that he had considered all of the plaintiff's medically determinable impairments, whether severe or non-severe, in assessing the RFC. Tr. 30.

The ALJ found that the plaintiff has no impairment or combination of impairments that meets or medically equals the severity of any listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 30. For physical impairments, the ALJ specifically considered Listing 1.00 (Musculoskeletal Disorders). Tr. 30. The ALJ explained that although medical records indicate that the plaintiff was diagnosed with arthropathies, the requirements of Listing 1.00 were not met. Tr. 30. The ALJ observed that no treating or examining physician documented findings equivalent in severity to the criteria of any listed impairment. Tr. 30.

The ALJ found that the plaintiff did not satisfy the "paragraph B" criteria. For the ability to understand, remember, or apply information, the ALJ found that the plaintiff has a mild limitation. Tr. 30. The ALJ gave this explanation:

> In her January 2023 assessment, Dr. [Jill] Rowan found the [plaintiff] has no limitation in this area (Ex. 3A [Tr. 149–55]). The [plaintiff] reported that he is able to drive, maintain his finances, and does not require reminders to take his medication or go places. [He] also reported that he is able to follow written and spoken instructions (Ex. 7E [Tr. 433–44]). Consistent with this, records from Dr. [Carlos] Torrellas do not document any significant abnormalities in the [plaintiff]'s cognitive functioning, as his thought content was unremarkable, with an intact thought process, memory, judgment, and insight, normal attention, and a normal ability to concentrate (Ex. 23F [Tr. 1821–56]). Further, at the August 18, 2023, hearing, the [plaintiff] testified that he is able to drive and participate at a local CrossFit gym.
>
> As to recent treatment, entries from late 2024 document similar findings and do not support the conclusion that the [plaintiff]'s condition has declined. Entries from October and December 2024 state that following mental status examinations[,] the [plaintiff] exhibited average intelligence, intact thought processes[,] and unremarkable thought content (Ex. 30F, pages 43-56 [Tr. 3711–24]). Overall, the record supports the conclusion that he is able to

> remember and apply information with [sic] any significant issues. In understanding, remembering or applying information, the [plaintiff] has a mild limitation.

Tr. 30.

For the ability to interact with others, the ALJ found that the plaintiff has a moderate limitation. Tr. 31. The ALJ gave this explanation:

> The [plaintiff] reported significant issues being around others, especially in public, which is understandable given the nature of the 2017 ambush and shooting. In contrast, Dr. Rowan found the [plaintiff] has a mild limitation in this area (Ex. 3A [Tr. 149–55]). Consistent with Dr. Rowan's report, in his Function Report, the [plaintiff] stated that he is able to go out alone. [He] also reported that he is able to maintain friendships and meets former co-workers for breakfast (Ex. 7E [Tr. 433–44]). Recent records from Dr. Torrellas note the [plaintiff] continues to train at a local gym (Ex. 23F [Tr. 1821–56]). During a February 2023 follow-up, the [plaintiff] was noted as attending a racing event and a party (Ex. 17F, page 12 [Tr. 1112]). During an August 2023 follow-up, [he] was described as cooperative, calm, and pleasant. [He] exhibited fluent and clear speech (Ex. 23F, pages 2-4 [Tr. 1822–24]). In addition, at the August 18, 2023, hearing, [he] testified that he and his wife travel in a recreational vehicle.
>
> At the December 11, 2024, hearing, the [plaintiff] testified that he has issues being around strangers and in public. However, [he] also testified that he continues to go to a local CrossFit gym on a daily basis and feels comfortable with the other gym members there. Entries as recent as December 2024 state that upon examination the [plaintiff] is cooperative, calm, and pleasant (Ex. 30F, page 55 [Tr. 3723]). While the record supports the conclusion that the [plaintiff] engages in a range of activities outside the home and is able to act in a socially appropriate manner, in accounting for [his] hypervigilance and statements concerning being in the general public, the undersigned finds that in interacting with others, the [plaintiff] has a moderate limitation.

Tr. 31.

For the ability to concentrate, persist, or maintain pace, the ALJ found that the plaintiff has a mild limitation. Tr. 31. The ALJ gave this explanation:

> Dr. Rowan found the [plaintiff] has no limitation in this area (Ex. 3A [Tr. 149–55]). The record is generally consistent with this portion of Dr. Rowan's assessment. Treatment entries from 2022 and 2023 from Dr. Torrellas state that upon examination the [plaintiff] exhibited normal attention and a normal ability to concentrate. For example, an August 2023 entry noted the [plaintiff]'s intelligence, attention, and ability to concentrate were found to be normal. [His] judgment and insight remained intact, as was his thought process. [He] exhibited no evidence of perceptual abnormalities (Ex. 23F, pages 2-4 [Tr. 1822–24]). Further, [he] reported he is able to drive and attend the gym, which supports the conclusion that he is able to maintain his focus for long enough periods to complete tasks.
>
> Recent treatment entries do not document any decline in this area. For example, September, October and December 2024 entries noted that upon examination the [plaintiff]'s attention and concentrating ability remained normal (Ex. 30F [Tr. 3669–724]). In viewing the evidence in a light most favorable to the [plaintiff], with regard to concentrating, persisting or maintaining pace, the [plaintiff] has a mild limitation.
>
> Dr. [Julie] Bruno found the [plaintiff] has a moderate limitation in this area (Ex. 1A [Tr. 140–47]). The undersigned finds this is not supported by the record and testimony. Treatment entries document the [plaintiff]'s attention and ability to concentrate as normal (Ex. 23F [Tr. 1821–56]). Dr. [Kevin] Kindelan administered a WAIS-IV examination, which measures passive attention and concentration[] skills and found the results were indicative of average to high-average performance (Ex. 15F [Tr. 1091–99]). As noted, recent entries from September, October and December 2024 document the [plaintiff]'s attention and ability to concentrate remain normal (Ex. 30F [Tr. 3669–724]). These entries are consistent with [his] ability to drive and attend college courses. At the December 11, 2024, hearing, [he] testified that he remains capable of riding his motorcycle. Given this, this portion of Dr. Rowan's [sic] assessment is unpersuasive.

Tr. 31–32.

For the ability to adapt or manage oneself, the ALJ found that the plaintiff has a mild limitation. Tr. 32. The ALJ gave this explanation:

> Dr. Rowan found the [plaintiff] has a mild limitation in this area (Ex. 3A [Tr. 149–55]). The record is generally supportive of this portion of Dr. Rowan's assessment. For example, the [plaintiff] stated that he is able to maintain his personal hygiene, get along with authority figures, and handle stress, though he has issues with changes in his routine (Ex. 7E [Tr. 433–44]). Entries from Dr. Torrellas describe the [plaintiff] as calm and cooperative, with a normal appearance, and intact judgment and insight (Ex. 23F [Tr. 1821–56]). Recent entries from Dr. Torrellas document similar findings, with the [plaintiff]'s insight and judgment found to be intact (Ex. 30F [Tr. 3669–724]). Treatment entries generally detail the [plaintiff]'s appearance as normal, with essentially normal findings concerning his speech, appearance, judgment and insight. Overall, the record supports the conclusion that he is able to regulate his emotions and control his behavior, as well as appreciate the need to avoid hazards. As for adapting or managing oneself, the [plaintiff] has experienced a mild limitation.

Tr. 32.

The ALJ found that the plaintiff likewise does not satisfy the "paragraph C" criteria. Tr. 32. The ALJ gave this explanation:

> The [plaintiff] does have a mental disorder that has lasted for at least two years. However, [he] does not require a highly structured setting in which to function and is able to travel. Further, as will be detailed …, treatment entries describe the [plaintiff]'s appearance as normal, and [he] responds well to treatment when he is compliant with recommendations (Ex. 23F [Tr. 1821–56]). As recently as December 2024 the [plaintiff] reported that he was "staying busy" with activities. The entry noted that following a mental status examination, [he] was calm, pleasant, and exhibited a normal attention span and intact judgment and insight. [His] intelligence was found to be average and his thought processes were intact (Ex. 30F, page 55 [Tr. 3723]). Thus, the record establishes that the [plaintiff] has a greater than minimal capacity to adapt to changes in his environment.

Tr. 32.

The ALJ found that the plaintiff has the RFC to perform light work with these additional limitations:

> [T]he [plaintiff] is limited to work that allows for a change of position at least once per hour, for one or two minutes. [He] can occasionally bend, stoop, climb stairs, kneel, and reach[] above shoulder level, but is unable to crouch, crawl, climb ladders, ropes or scaffolds, or work around unprotected heights. [He] is further limited to work that requires no more than occasional interaction with the general public.

Tr. 33.

The ALJ summarized the evidence:

> The [plaintiff] is alleging disability due to a variety of physical and mental health issues. [He] states that he experiences pain in his abdomen, hips, left arm, and back. [He] describes the pain as sharp, aching and severe in nature. As to his mental health, the [plaintiff] states that he experiences severe nightmares as a result of his PTSD. [He] states that he is unable to perform chores (Ex. 7E and 8E [Tr. 433–50]).
>
> The [plaintiff] was employed as a Federal Aviation Law Enforcement Officer. On September 26, 2017, [he] was ambushed and shot multiple times by an 18-year-old man. The shooter then committed suicide. The [plaintiff] was hospitalized with gunshot wounds to the right abdomen, left and right thighs, and left forearm. [He] experienced hemorrhagic shock and a liver laceration. In response, [he] underwent emergency surgery for management of abdominal wounds, placement of a central venous catheter, laparotomy, and right chest tube placement for management of hemothorax. [He] would undergo additional surgeries to address his acute kidney injury and respiratory insufficiency. [He] was eventually transferred to an inpatient rehabilitation facility at Orange Park Medical Center. On October 31, 2017, [he] was discharged home with a colostomy bag, abdominal wound vac, and peripherally inserted central catheter (PICC) line. **The [plaintiff] then began a course of physical therapy**.

On January 2, 2018, the [plaintiff] returned to work with light duty restrictions due to the colostomy. On February 23, 2018, [he] underwent a colostomy reversal. **On April 9, 2018, [he] returned to full duty work**. **According to a medical summary prepared by Dr. Harry Doyle, M.D., an undated statement noted the [plaintiff] "has resumed his law enforcement duties full time full duty as he is able to perform his regular duties within his restrictions and has been determined to be at maximum medical improvement[.]"** (Ex. 10F, pages 2-4 [Tr. 1003–05]).

On March 18, 2019, the [plaintiff] was seen by Dr. Kenneth Powell for an evaluation of his hand and hip pain. The [plaintiff] reported his pain was worsened by prolonged standing and sitting and improved with exercise. [He] also reported generalized lower abdominal pain. It was noted that [he] had been back at work for over a year. At that time, [his] medications included tramadol, hydromorphone, and morphine. Upon examination, the [plaintiff] was in no acute distress, exhibited hip pain with active range of motion testing, and a slightly antalgic gait due to pain. [He] also exhibited decreased sensation in his lower extremities. [He] was cooperative and appropriately groomed, exhibited an appropriate affect and demeanor, with normal speech, and intact cognition (Ex. 4F, pages 21-23 [Tr. 727–29]). An entry from the Mayo Clinic noted the [plaintiff] had a large hernia involving the upper portion of the incision as well as a left lower quadrant hernia. However, [he] exhibited no abdominal distension, with a normal appearance and bowel sounds. [He] exhibit[ed] pain with hip range of motion testing but retained a normal range of motion. As to the remainder of his musculoskeletal system, it retained a normal range of motion without tenderness or deformity. [His] reflexes, muscle tone, coordination, and gait were normal. Mentally, [his] mood, affect, behavior, speech, cognition, memory, judgment and thought content were normal (Ex. 17F, page 51 [Tr. 1151]).

During an April 8, 2019, follow-up, the [plaintiff] reported a reasonable level of pain relief with his current medication regimen, with a noted improvement in function and activity tolerance and no adverse side effects (Ex. 4F, page 17 [Tr. 723]). Dr. Powell placed the [plaintiff] on temporary work disability. The [plaintiff] underwent evaluations in May 2019. At that time, [he] was found to be at high risk for small bowel strangulation (Ex. 4F and 10 [Tr. 707–30]). A May 24, 2019, entry described [his] gait as mildly antalgic upon examination, with hip flexion and internal rotation pain but with no significant pain with hip roll testing. [He] retained full strength with

ankle and plantar flexion and his sensation was intact. Findings concerning his neck, vascular system, and pulmonary system were normal. [He] exhibited appropriate psychological findings and was cooperative, with a reasonable thought process (Ex. 17F, page 43 [Tr. 1143]).

On July 17, 2019, the [plaintiff] was seen for an evaluation. At that time, [he] denied thoracic pain but reported pain along the right side of his pelvis. [He] reported that he felt a pop in his pelvis during rehabilitation therapy the week prior to the evaluation. **[He] reported that since that date his pain symptoms had decreased. Upon examination, [he] exhibited a slightly antalgic gait**. Findings concerning his neck were normal, with normal alignment, extension, flexion, and rotation. **Findings concerning his abdomen were normal, with no evidence of peristalsis or abnormal movement**. Respiratory and cardiovascular findings were normal. [He] was described as alert, cooperative, and appropriately groomed, with an appropriate affect and normal speech pattern. **After reviewing imaging, Dr. [William] Neway recommended against surgery. The [plaintiff] was found to have a 47 percent permanent impairment rating of the right hip. Dr. Neway released the [plaintiff] to full duty with the exception of travel outside the United States and Canada (Ex. 3F [Tr. 705–06])**.

Following an August 7, 2019, follow-up, the [plaintiff] reported an improvement in pain symptoms. [He] was released to full duty work. Dr. Powell stated the [plaintiff] should limit travel to the US and Canada. The [plaintiff] was cleared to fly mission flights of three hours or less in duration. August 2019 knee x-rays revealed mild to moderate narrowing and osteophytosis of the medial and lateral knee joint space compartments, unremarkable soft tissues, and normal bone density. Images of the [plaintiff]'s hips revealed excellent alignment, normal bone density, no degenerative changes or unusual arthropathy, and normal soft tissues. Right and left ankle x-rays were normal, with no evidence of a joint effusion, an intact ankle mortise, normal bone density, and normal soft tissues. In October 2019, the [plaintiff] was transferred to a local instructor position in Jacksonville, Florida (Ex. 4F, pages 8-9 [Tr. 714–15]; 6F, pages 19-22 [Tr. 941–44]; and 10F [Tr. 1002–56]).

On January 5, 2020, the [plaintiff] was promoted to Instructor at the Air and Marine Operations Basic Academy in Brunswick, Georgia. According to the summary from Dr. Doyle, the [plaintiff] experienced

a marked increase in pain symptoms due to the physical demands of his new job.

The [plaintiff] reported that prolonged standing aggravated his pain and required him to change positions every 10 to 15 minutes. [He] reported that his chronic pain triggered traumatic memories of the shooting and resulted in anxiety, insomnia, intrusive thoughts, hypervigilance, and a decreased ability to concentrate. In a report dated August 19, 2020, Dr. [Morley] Slutsky assigned the [plaintiff] impairment ratings of 38 percent for the left lower extremity, 12 percent for the right wrist, and 15 percent for the left upper extremity (Ex. 10F, page 5 [Tr. 1006]).

In 2021, the [plaintiff] continued to work on a full-time basis. [He] reported that the physical demands of his job continued to result in a marked increase in pain symptoms. [He] also reported that the demands of his job, which included placement of students in violent situations and gunfire, exacerbated his mental health issues (Ex. 10F, pages 5-6 [Tr. 1006–07]).

Dr. Doyle evaluated the [plaintiff] in March 2021 (Ex. 10F [Tr. 1002–56]). Following the evaluation, Dr. Doyle diagnosed the [plaintiff] with PTSD and a somatic symptom disorder. Dr. Doyle concluded that the [plaintiff] was totally disabled and not a suitable candidate for vocational rehabilitation.

On February 8, 2022, the [plaintiff] underwent a consultative examination with Dr. [Donald] Auerbach (Ex. 14F [Tr. 1083–90]). At the time, the [plaintiff] complained of constant pain, primarily in his abdomen. [He] stated he used a cane to assist with ambulation. [He] reported that he engaged watching television, listening to the radio, and reading. [He] reported that he did not require assistance at home. Following the examination, the [plaintiff] was diagnosed with PTSD and morbid obesity.

On February 21, 2022, the [plaintiff] underwent a consultative examination with Dr. Kindelan, Ph.D. (Ex. 15F [Tr. 1091–99]). At that time, the [plaintiff] reported issues with intrusive thoughts, anxiety, and insomnia. [He] stated that he treated with a psychiatrist on a monthly basis. **[He] reported that he was attending college and had to complete five courses in order to obtain a B.A. degree in Disaster and Emergency Management**. Following the examination, Dr. Kindelan diagnosed the [plaintiff] with PTSD, a somatic symptom disorder, and an insomnia disorder.

On May 9, 2022, the [plaintiff] was seen for follow-up treatment. [He] reported that he was involved with a group of officers and had experienced increased symptoms following the death of an officer in the group. [He] reported he remained uncomfortable going to areas with a lot of unknown individuals. The entry noted, "I have discussed with him the possibility to consider the use of any other psychotherapeutic medications to help him to further relieve some of the symptomatology that he is experiencing, but he still insists that he would like to work in psychotherapy." The [plaintiff] reported that he was involved in group therapy and seeing a "Christian healer-based therapist." The [plaintiff] stated, "I'm trying to work to see if I can help myself[.]" (Ex. 23F, pages 32-33 [Tr. 1852–53]).

In December 2022, the [plaintiff] underwent a left knee injection. In February 2023, [he] reported improvement in his pain symptoms following the injection. [He] reported that he could not resume full physical exercise and was avoiding running due to the residual sensation in his knee. However, [he] reported he was able to tolerate rowing on a machine. Upon examination, the [plaintiff] exhibited no tenderness or deformity in his musculoskeletal system. [He] exhibited a normal range of motion and exhibited no erythema or warmth in his feet. Findings concerning his abdomen, vascular, cardiovascular and pulmonary systems were normal. [He] was alert and oriented, and exhibited normal coordination, judgment, speech, behavior, and thought content (Ex. 17F, pages 12-13 [Tr. 1112–13]).

On August 15, 2023, the [plaintiff] was seen for follow-up treatment and medication management of his anxiety and PTSD. The entry noted the [plaintiff] was doing well and compliant with his medication regimen. [He] reported that therapy was effective. Though he continued to report thoughts of death, this was within the context of a friend's passing two days prior to the appointment. [His] mood was described as stable, without changes, and described his sleep as improved. [He] reported that he felt unsafe when leaving his home but denied mood swings and anger outbursts. **[He] reported that exercising helped him with his mood and going to the gym relieved stress**. Upon examination, the [plaintiff] was described as cooperative, calm, and pleasant. [He] exhibited fluent and clear speech. [His] intelligence, attention, and ability to concentrate were found to be normal. [His] judgment and insight remained intact, as was his thought process. [He] exhibited unremarkable thought content, with no evidence of perceptual abnormalities, and with [him] denying suicidal or homicidal ideation.

[His] Prazosin and Wellbutrin medications were continued (Ex. 23F, pages 2-4 [Tr. 1822–24]).

Subsequent examinations do not document any significant decline in the [plaintiff]'s mental health. During a December 3, 2024, follow-up, [he] reported issues with nightmares, poor sleep, memory impairment, and difficulties being around others during the Thanksgiving holidays. However, the entry also noted that he reported he was feeling better and less anxious, and that **he continued to stay busy and attend a local gym**. [He] reported that an increase in his Prazosin medication had helped decrease his nightmares, with the exception of the previous week. [He] reported that he did not feel depressed. [He] reported that his energy and motivation were "so-so." **[He] stated that he had no issues with his daily living activities** and that his mood was "ok." [He] reported stress due to his health issues but also that he was managing his day-to-day stress, and that the medication helps him "maintain." Following an examination, the [plaintiff] was described as stressed, but cooperative, calm, and pleasant. [He] exhibited fluent and clear speech. [His] motor activity, insight, judgment, and thought processes were intact. [His] thought content was unremarkable. [His] attention and concentrating ability were normal, his intelligence was found to be average, and he exhibited no abnormalities in his perception or cognition. [He] denied issues with suicidal or homicidal ideation. Diagnoses at that time were of PTSD, a pain disorder with a psychological factor, and a mild depressive disorder (Ex. 30F, pages 53-56 [Tr. 3721–24).

At the August 18, 2023, hearing, the [plaintiff] testified that he required use of an ostomy bag for approximately six months following the surgery. **[He] testified that three bullets remain, one near his T12 vertebrae, one in his right hip, and one in his left hip. [He] testified that the bullets "pull" on his scar tissue and result in pain symptoms. [He] testified that the bullet located in his thoracic spine results in the least amount of pain symptoms**.

The [plaintiff] described his most significant issues as being in his abdomen and hips. At the August 18, 2023, hearing, [he] testified that it is in those locations where his pain is most severe, and his functioning is most limited. [He] testified that he is unable to stand for periods greater than 15 minutes. [He] testified that he is able to sit for periods of 15 to 20 minutes before needing to readjust positions. [He] testified that it is difficult to bend and walk. [He]

testified that it is difficult to perform tasks as simple as tying his shoes.

At the August 18, 2023, hearing, the [plaintiff] was asked about his current treatment and testified that he treats with a physical therap[ist] and receives mental health treatment. [He] testified that he attends physical therapy once per week.

At the August 18, 2023, hearing, the [plaintiff] testified that his left knee was injured prior to the shooting. [He] testified that he is able to kneel for only very short periods. [He] testified that he has difficulties with crouching and getting into and out of cars.

At the August 18, 2023, hearing, the [plaintiff] testified that he lived with his wife in a two-story home. At the August 18, 2023, hearing, [he] testified that it is difficult to climb the stairs at home. [He] testified at the August 18, 2023, hearing, that he was receiving Workers' Compensation benefits.

The [plaintiff] purchased a 44-foot-long motorhome in April 2023. At the August 18, 2023, hearing, [he] testified that he drove the vehicle down from Michigan to his home in Florida. [He] testified that the trip took approximately four days, with [him] driving approximately five hours per day. [He] testified that he would have to stop approximately once every hour. [He] testified that he uses the vehicle for short trips.

As to his mental health, the [plaintiff] testified at the August 18, 2023, hearing that he has PTSD following the incident. [He] testified that he experiences depression, anxiety, and insomnia. [He] testified that he experiences nightmares approximately two or three times per week. [He] testified that due to his insomnia he naps during the day. [He] testified that being in public places could trigger anxiety. [He] testified that he is hypervigilant, experiences intrusive thoughts, and experiences mental fatigue.

An entry signed on March 18, 2019, noted the [plaintiff] reported pain after lifting weight in January 2019. The entry stated, "He was lifting heavy weights above his head with a barbell. He denies any progression of pain since that time, however it has improved and then worsened at times." [His] pain symptoms were noted to be over the lateral aspect of the right wrist (Ex. 22F, page 5 [Tr. 1797]).

Entries from Dr. Torrellas state the [plaintiff] attends a local gym (Ex. 23F [Tr. 1821–56]). The [plaintiff] testified that he attends a

local CrossFit gym and has done so for approximately 11 years. At the August 18, 2023, hearing, [he] testified that the workouts are scaled down to accommodate his limitations. [He] testified that he requires abdominal support to complete certain exercises.

On December 6, 2023, the [plaintiff] underwent left total knee replacement surgery. The undersigned notes that at the time of the surgery the [plaintiff]'s gross muscle strength in his upper extremities and right lower extremity were within functional limits. [His] flexibility in his upper extremities and right lower extremities were also found to be within functional limits (Ex. 29F, page 477 [Tr. 3644]).

Following surgery, the [plaintiff] underwent a course of physical therapy. By December 11, 2023, [his] range of motion was described as improved (Ex. 29F, page 462 [Tr. 3629]). A December 26, 2023, entry noted that [he] was ambulating without use of a straight cane, though his gait remained antalgic (Ex. 29F, page 404 [Tr. 3571]). A December 29, 2023, entry noted that [he] ambulated without use of a cane. [His] gait remained antalgic, though he exhibited an improved ability to active quadriceps contraction (Ex. 29F, page 394 [Tr. 3561]).

At the December 11, 2024, hearing, the [plaintiff] testified that he continues to experience left knee pain and buckling despite the December 6, 2023, left knee replacement surgery. [He] testified that surgery has not been recommended for his right knee. [He] testified that he continues to experience intense left knee and leg pain. [He] testified that he experiences right knee soreness and bilateral knee buckling. [He] testified that he experiences right knee pain but that it is not as severe as his left knee pain.

At the December 11, 2024, hearing, the [plaintiff] testified that he experiences a popping sensation in his right hip, along with pain. [He] testified that he experiences this on a constant basis. [He] testified that he underwent x-rays and that his physicians have informed him they will monitor the condition. [He] testified that the symptoms affect his ability to perform activities such as squatting, bending, and twisting.

At the December 11, 2024, hearing, the [plaintiff] testified that he wears a left knee brace. [He] testified that the brace was not prescribed by a physician. [He] testified that he is unable to kneel and has difficulty bending, climbing stairs and getting into and out

of cars. Asked to estimate, the [plaintiff] testified that he does not stand for periods greater than 15 minutes due to pain.

At the December 11, 2024, hearing, the [plaintiff] testified that he continues to visit a local gym. [He] testified that his physical therapist recommended he continued to exercise at the gym. [He] testified that he primarily undergoes "up and down" movements. [He] testified that he is familiar with the people at the gym and that they do not exacerbate his anxiety symptoms.

At the December 11, 2024, hearing, the [plaintiff] was asked about his abdomen. [He] testified that he continues to experience abdominal pain. [He] testified that he attends rehabilitation on a weekly basis for the injury. [He] testified that his abdomen is massaged weekly in order to prevent scar tissue hardening. [He] testified that the pain symptoms interfere with his ability to sit and twist. [He] testified that he is able to sit for periods up to 10 minutes before needing to alternate his position. [He] testified that he is able to carry items for only short distances, such as from his car to inside his home.

The [plaintiff] was asked about his mental health issues at the December 11, 2024, hearing. [He] testified that he continues to receive treatment. [He] testified that he experiences nightmares, intrusive thoughts, and anxiety in crowds. [He] testified that the anxiety causes an elevated heart rate and mental fatigue. [He] testified that he experiences difficulties concentrating on tasks. [He] testified that he continues to treat with Drs. [Jesse] Collins and Torrellas. [He] also testified that he attends group therapy.

Asked about his daily activities at the December 11, 2024, hearing, the [plaintiff] testified that he requires assistance from his wife for chores such as laundry or taking out the trash. [He] testified that he occasionally requires assistance getting out of bed. [He] testified that he has used his motorhome on two occasions since the August 18, 2023, hearing. [He] testified that one of those occasions was to avoid a hurricane and that they drove from Jacksonville, Florida, to Panama City, Florida. **[He] testified that he continues to ride his motorcycle once every six weeks. [He] estimated that the motorcycle weighs approximately 300 pounds**.

The [plaintiff] testified that he continues to visit a local CrossFit gym. [He] testified that he uses a rowing machine but testified that it is difficult to use, and he could do so for only a few minutes. [He] testified that he is able to perform five or six bodyweight squats while

> holding onto something. [He] testified that he is able to use an exercise bike for short periods. [He] testified that he is able to perform bench presses.

Tr. 33–39 (emphases added).

The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements about the intensity, persistence, and limiting effects of the symptoms are not entirely consistent with the medical evidence and other evidence in the record. Tr. 40. Regarding the plaintiff's physical impairments, the ALJ gave this explanation:

> As detailed in the previous decision, the [plaintiff] testified to ongoing abdominal and groin pain as a result of his injuries and surgical history, which is consistent with the records. At the December 11, 2024, hearing, [he] testified that he continues to experience abdominal pain and limited functioning due to the pain symptoms. The record reveals that [he] exhibited evidence of a bowel perforation requiring diverting ileostomy. [His] most recent surgery was on February 23, 2018, and [his] abdominal pain symptoms have been primarily over the site of the ileostomy and the upper abdomen ( e.g., Ex. 17F, pages 6 and 26 [Tr. 1006, 1026]). A March 17, 2021, entry noted [his] reported abdominal pain resulted in physical limitations with sitting and squatting. [He] reported that his job requirements included such activities and that his abdominal pain made it difficult to perform his job duties (Ex. 17F, page 32 [Tr. 1132]).
>
> The undersigned has found the [plaintiff] is unable to perform his past work. However, the objective findings upon examination support the conclusion that the [plaintiff]'s issues do not preclude a reduced range of light work. **A March 1, 2024, entry noted increased sensitivity over the abdominal wall, at baselines, and a stable midline incision. There was no evidence of abdominal tenderness. The [plaintiff]'s abdomen was soft with no evidence of hepatomegaly or splenomegaly. Bowel sounds were normal and there was no evidence of distension. The [plaintiff] was noted to exhibit a normal appearance and was in no acute distress. It was recommended [he] continue**

**with physical therapy (Ex. 26F pages 68-70 [Tr. 1931–33]). A March 6, 2024, entry noted that [he] exhibited a prominence at the lower sternum. However, [his] gross muscle strength and flexibility were found to be within functional limits and [he] was described as being in no acute distress (Ex. 27F, page 59 [Tr. 2239]). An April 10, 2024, entry noted that [his] abdomen was soft and non-tender (Ex. 27F, page 23 [Tr. 2203]). A CT scan revealed no acute process within the abdomen or pelvis, fatty infiltration of the liver, and benign chronic findings (Ex. 27F, pages 25 and 45 [Tr. 2205, 2225]). An April 17, 2024, entry noted that [he] was not currently taking pain medication and continued to lose weight. The entry also noted that hip surgery was not warranted (Ex. 27F, page 4 [Tr. 2184]). An April 24, 2024, entry noted that [he] continued to report abdominal pain. However, he exhibited decreased abdominal girth with weight loss and his prognosis remained good. There were no recent changes or increase in his left ileostomy site protrusion (Ex. 27F, pages 1-2 [Tr. 2181–82])**.

Earlier entries document similar findings. For example, a March 2023 entry documented the [plaintiff]'s abdomen as soft and non-tender with normal vascular findings (Ex. 17F, page 10 [Tr. 1110]). Following a February 2023 examination, [his] abdomen was described as soft and nontender. [He] exhibited normal bowel sounds and no evidence of distension, hepatomegaly, or splenomegaly (Ex. 17F, page 13 [Tr. 1113]). Earlier results document similar findings. A January 2022 entry noted that upon examination the [plaintiff]'s abdomen was described as soft and non-tender. [He] exhibited normal bowel sounds and no evidence of distension, hepatomegaly, or splenomegaly (Ex. 17F, page 29 [Tr. 1129]). A September 2020 entry noted similar results upon examination (Ex. 17F, page 39 [Tr. 1139]).

The [plaintiff] was able to return to work on a full-time basis following his abdominal surgeries. A March 2019 entry documents him as lifting heavy weights (Ex. 22F [Tr. 1793–1820]). Entries from 2022 and 2023 document him as participating in CrossFit classes and using a rowing machine (Ex. 17F and 23F [Tr. 1101–1338, 1821–56]). At the August 18, 2023, hearing, [he] testified that he was able to drive a large recreation vehicle. At the December 11, 2024, hearing, [he] testified that he was able to ride a motorcycle. Overall, these activities support the conclusion that the [plaintiff]'s history of abdominal surgery and his ongoing symptoms do not preclude a reduced range of light work.

An April 2019 CT scan of the [plaintiff]'s abdomen revealed mild degenerative changes in the hips, no fracture or focal osseous lesion, and several irregular metallic densities (Ex. 17F, page 161 [Tr. 1261]). A scan revealed hepatic steatosis, a normal gallbladder, mild increased echogenicity, and normal findings concerning the intrahepatic ducts, pancreas and right kidney (Ex. 17F, page 158 [Tr. 1258]). Overall, the [plaintiff]'s activities and the objective findings upon examination support the conclusion that he has responded to treatment.

The undersigned has considered the [plaintiff]'s physical therapy records. An August 2023 entry noted that [he] continued to demonstrate positive changes with lifestyle changes, dropping 20 pounds, with a decrease in abdominal girth. [He] was noted to exhibit a decrease in his cholesterol and triglyceride levels (Ex. 29F, pages 68-69 [Tr. 3235–36]). A June 2023 entry noted that there was an increase in boney prominence of the sternum proximal to the xiphoid process. It was recommended the [plaintiff] undergo testing to rule out a hernia (Ex. 20F, page 7 [Tr. 1348]). Another June 2023 entry noted that the left ileostomy site continued to protrude, but without recent changes or increase in the protrusion (Ex. 20F, page 12 [Tr. 1353]). Earlier entries detailed similar findings (Ex. 20F, pages 27, 32 [Tr. 1368, 1373]). Despite this, according to the therapist, the [plaintiff]'s potential to reach his established goals remained good (Ex. 20F, page 20 [Tr. 1361]). The objective findings and [the plaintiff]'s activity levels, the examination results and scans, and the [plaintiff]'s testimony at the August 18, 2023, hearing, concerning his daily activities support the conclusion that the [plaintiff]'s abdominal pain does not result in additional limitations.

Overall, the record and testimony support the conclusion that the [plaintiff] is capable of performing a reduced range of light work. **An April 2024 entry noted that hip x-rays revealed mild osteoarthritic changes, consistent with early symptomatic osteoarthritis of the hip. There was little change from a previous study. There was no evidence of fracture or osseous lesion. Given his reported catching symptoms, there was also concern of a possible labral tear (Ex. 26F, pages 43 and 45 [Tr. 1906, 1908]). As previously detailed, August 2019 knee x-rays revealed mild to moderate narrowing and osteophytosis of the medial and lateral knee joint space compartments, unremarkable soft tissues, and normal bone density. Images of the [plaintiff]'s hips revealed excellent alignment, normal bone density, no degenerative changes or unusual**

**arthropathy, and normal soft tissues. Right and left ankle x-rays were normal, with no evidence of a joint effusion, an intact ankle mortise, normal bone density, and normal soft tissues (Ex. 6F, pages 19-22 [Tr. 941–44]). These findings support the conclusion that the [plaintiff] is capable of standing and walking in a manner consistent with the [RFC] assessment**.

Examinations are also consistent with this conclusion. A January 30, 2024, entry noted that approximately eight weeks after his surgery the [plaintiff] demonstrated an excellent range of motion, to 110 degrees. [He] was noted to no longer require opioid or over-the-counter pain medication. [He] did not require use of gait aids, resumed driving, could climb stairs, and returned to the gym. Upon examination at that time, [he] exhibited satisfactory patellar tracking, and an active range of motion to 125 degrees, with a strong straight leg raising result. [He] exhibited a satisfactory gait pattern. Left knee x-rays revealed the arthroplasty was in satisfactory position without evidence of loosening failure or fracture (Ex. 26F, page 81 [Tr. 1944]). A February 21, 2024, entry noted that [he] exhibited gross muscle strength and flexibility that were within functional limits (Ex. 27F, page 71 [Tr. 2251]).

Subsequent entries document similar results. A March 1, 2024, entry noted the [plaintiff] reported a good recovery from his surgery. [He] reported some residual swelling but improving discomfort. At that time, [he] reported he exercised daily for one hour per day. Upon examination, [he] exhibited normal coordination, a supple neck, and a normal range of motion in his musculoskeletal system, with no evidence of tenderness or deformity. [His] feet exhibited no erythema or warmth. Cardiovascular and pulmonary findings were normal. [He] exhibited a normal appearance and was in no acute distress (Ex. 26F, pages 67-69 [Tr. 1930–32]). An April 2, 2024, entry noted that upon examination [he] exhibited a slowed gait. However, there was no significant hip pain with logroll or hip flexion with internal rotation. [He] exhibited some mild pain with a Stinchfield maneuver but was non-tender to palpation along the lateral aspect of the greater trochanter. [He] was in no acute distress. [His] strength was normal throughout the upper and lower extremities. Vascular findings were normal, and [his] incision was described as well-healed. Respiratory findings were also normal (Ex. 26F, page 42 [Tr. 1905]).

Entries from 2023 also support this conclusion. For example, following a February 2023, examination, the [plaintiff] exhibited no

tenderness or deformity in his musculoskeletal system. [He] exhibited a normal range of motion and exhibited no erythema or warmth in his feet. Findings concerning his abdomen, vascular, cardiovascular and pulmonary systems were normal. **At that time, [he] reported that he could use a rowing machine, supporting the conclusion that he retained the requisite strength in his legs and core to perform a reduced range of light work (Ex. 17F, pages 12-13 [Tr. 1112–13]).**

A March 2023 entry noted the [plaintiff]'s gait was antalgic. **However, thrust and Trendelenburg tests were negative, [he] retained flexion to 120 degrees and there was no evidence of effusion, crepitation, or tenderness, with anterior drawer, posterior drawer, varus and valgus results all negative and [his] strength and sensation intact, which suggests that [his] antalgic gait, when viewed in context with the remainder of the findings, would not preclude standing, walking and moving about in a manner consistent with the [RFC] assessment.** Abdominal findings were normal, as were vascular and respiratory. Images of [his] knee revealed medial compartment osteoarthritis with left-sided narrowing that was moderate in severity (Ex. 17F, pages 7-11 [Tr. 1107–11]).

Entries from 2024 support the conclusion that the [plaintiff] responded well to his knee replacement surgery. A December 22, 2023, entry, shortly after his surgery, noted that while he exhibited moderate left lower extremity weakness. However, his right lower extremity and upper extremities were noted to exhibit functional strength. In addition, the right lower extremity range of motion and the upper extremity range of motion were within functional limits (Ex. 28F, page 3 [Tr. 2673]). By December 29, 2023, [he] reported that he was doing better and was working on his knee extension (Ex. 28F, page 13 [Tr. 2683]). The entries previously detailed from 2024 support the conclusion that the [plaintiff] continued to progress following surgery and is capable of a reduced range of light work.

Given the [plaintiff]'s testimony, the undersigned has concluded that the [plaintiff] is limited to work that allows him to change position at least once per hour for one to two minutes, with occasional bending, stooping, kneel, and climbing stairs, and no crawling, crouching, or climbing of ladders, ropes or scaffolds. This would account for the [plaintiff]'s knee, hip, and other related pain symptoms. The objective findings in the record support the conclusion that he is not limited further.

Tr. 40–43 (emphases added).

Regarding the plaintiff's mental impairments, the ALJ gave this explanation:

> The undersigned has found the [plaintiff]'s mental health issues result in a moderate limitation in his social functioning. However, the record supports the conclusion that this limitation does not preclude [him] from performing work that requires no more than occasional contact with the general public. A December 22, 2023, entry noted that upon examination the [plaintiff] exhibited an appropriate mood and affect. [He] exhibited no attentional deficits and was alert and oriented (Ex. 28F, page 3 [Tr. 2673]). A March 1, 2024, entry noted that upon examination [his] speech, behavior, thought content, and judgment were all normal. At that time, [his] PTSD was described as stable (Ex. 26F, pages 69-70 [Tr. 1932–33]). A March 6, 2024, entry noted that upon examination [he] exhibited an appropriate mood and affect. [He] exhibited no attentional deficits and was alert and oriented (Ex. 27F, page 59 [Tr. 2239]). An April 2, 2024, entry noted that the [plaintiff] was alert and oriented, with a normal mood and affect (Ex. 26F, page 42 [Tr. 1905]).
>
> Recent entries from Dr. Torrellas document stable findings. August 13, September 10, October 10, October 31, and December 3, 2024, entries noted that upon examination the [plaintiff] was cooperative, calm and pleasant. [He] exhibited fluent, clear, and normal speech. [He] exhibited normal attention and concentrating ability. [His] judgment, insight, and thought processes were intact. [His] thought content was unremarkable. [His] intelligence was average, and there were no abnormalities noted in his perception or cognition. [He] denied suicidal and homicidal ideation (Ex. 30F, pages 43, 47, 51, and 55 [Tr. 3711, 3715, 3719, 3723]). **These entries noted that the [plaintiff] report[ed] that he stayed busy and continued to attend the gym. The entries also noted that [he] reported no issues with his daily living activities**.
>
> The [plaintiff] has testified to issues getting along with others, and treatment records document his various symptoms, including anxiety and hypervigilance. However, the findings concerning his ability to cooperate with medical providers, use language in a socially appropriate manner, and exhibit an appropriate appearance, along with his ability to attend a gym on frequent basis, support the conclusion that he retains the social readiness, ability to engage in

effective communication, and ability to engage in social interactions with supervisors and co-workers, in an environment that requires no more than occasional interaction with the general public. The findings concerning his thought content, thought process, insight and judgment support the conclusion that he is able to make sound and appropriate decisions. The findings concerning his thought content, attention, and concentration support the conclusion that his mental health issues do not result in symptoms that preclude work on a consistent basis.

As detailed in the previous decision, entries from 2023 support this conclusion. For example, upon examination during a February 7, 2023, follow-up, the [plaintiff] was anxious, with difficulty focusing. However, the remainder of the examination was normal. As to his social functioning, the [plaintiff] was well groomed, clean, cooperative, calm, and pleasant, with an euthymic mood. As to his cognitive functioning, the [plaintiff]'s thought content was unremarkable, with an intact thought process, memory, judgment, and insight, normal attention, and a normal ability to concentrate (Ex. 23F, page 24 [Tr. 1844]). These results are consistent with the conclusion that the [plaintiff] maintains sufficient mental and emotional stability to interact with the public on an occasional basis. [His] insight and judgment being intact supports the inference that he is able to maintain awareness and understanding of his mental health issues and make sound judgments. These findings concerning his appearance and ability to interact with the examiner support the conclusion that he is able to act in a socially appropriate manner.

Subsequent entries document similar results. A February 28, 2023, entry noted similar findings upon examination, though the [plaintiff] was no longer anxious (Ex. 23F, page 22 [Tr. 1842]). During a March 14, 2023, follow-up, [he] was noted to have been prescribed Wellbutrin and reported a decrease in hypervigilance and that he was calm and "less on the edge." [He] reported his mood was stable. The only abnormality upon examination was [his] difficulty focusing. Findings concerning his appearance, cognitive functioning, and ability to interact remained normal (Ex. 23F, page 20 [Tr. 1840]). During an April 11, 2023, follow-up, [he] reported he visited the Publix store where the shooting occurred and "he was less anxious." [He] reported a decrease in hypervigilance and nightmares, a stable mood, and improved sleep. Findings upon examination remained unchanged (Ex. 23F, pages 17-18 [Tr. 1837–38]). During May 9 and May 23, 2023, follow-ups, [he] reported an ongoing positive response to Wellbutrin, with improvement in his hypervigilance, nightmares,

edginess, and fidgetiness. Findings upon examination remained unchanged (Ex. 23F, pages 11-15 [Tr. 1831–35]). During a June 20, 2023, follow-up, [he] reported an increase in his Prazosin medication helped with his dreams and that he averaged approximately seven to eight hours of sleep per night (Ex. 23F, pages 8-10 [Tr. 1828–30]). These entries support the conclusion that the [plaintiff]'s mental health issues are stable with treatment and that [he] could perform work in accordance with the [RFC] assessment.

During a July 18, 2023, follow-up, the [plaintiff] reported he was compliant with treatment recommendations and doing well. [He] reported that he continued to experience dreams, but they did not wake him. [He] reported ongoing issues with hypervigilance and fear while out in public. However, he continued to visit a local gym. The findings upon examination remained the same. He was calm, pleasant, and cooperative, with normal speech, attention, and concentrating ability, and a pleasant affect. [His] insight and judgment remained intact, as did his motor activity (Ex. 23F, pages 5-6 [Tr. 1825–26]). An August 15, 2023, entry no longer included the finding that he had difficulty focusing, suggesting ongoing improvement with treatment. [He] reported thoughts of death following the passing of a friend, but also reported being less on edge, less fidgety, and stable in his mood. [He] continued to visit the gym and findings upon examination were normal. [He] was cooperative, calm, and pleasant, with fluent speech, intact insight, judgment, and thought processes, unremarkable thought content, intact motor activity, normal attention, average intelligence, and a normal ability to concentrate (Ex. 23F, pages 2-4 [Tr. 1822–24]).

Given the findings concerning his attention, intelligence, thought content, and ability to concentrate, the record supports the conclusion that [the plaintiff] is not limited to unskilled work. [He] reported improvement in his functioning with medication. Further, his overall presentation is normal, and he is able to communicate with others and behave in a socially appropriate manner.

Other portions of the record are consistent with these entries. The [plaintiff]'s physical therapy records document [him] as cooperative, eager to please, and easily engaged. [His] strengths included his enjoyment of social interaction, consistent with the conclusion that he does not experience disabling limitations in his ability to interact with others (Ex. 20F, page 8 [Tr. 1349]). A February 2023 entry from the Mayo Clinic documented [his] speech, behavior, thought content, and judgment as normal (Ex. 17F, page 13 [Tr. 1113]). A March 2023

entry from the Mayo Clinic documents [his] mood and affect as normal (Ex. 17F, page 10 [Tr. 1110]).

The [plaintiff]'s daily activities also support the conclusion that he does not socially isolate himself to a degree that would preclude work in accordance with the [RFC] assessment. **For example, records from Dr. Torrellas document the [plaintiff] visiting a local CrossFit gym on a consistent basis** (Ex. 23F [Tr. 1821–56]). (Ex. 15F [Tr. 1091–99]). **During his examination with Dr. Kindelan, the [plaintiff] stated he could drive, visit with neighbors, read, prepare simple meals, use a smartphone, and attend college courses (Ex. 15F [Tr. 1091–99]). At the hearing, the [plaintiff] testified that he travels with his wife and was able to drive a recreational vehicle from Michigan to Florida**. The undersigned notes that a February 2023 entry from the Mayo Clinic documented the [plaintiff]'s issues with increased symptoms. However, this occurred within the context of the [plaintiff] attending a racing even[t] in which a person had a fake gun and attending a party in which the parents of the gunman were present, which are both understandable reactions to stressful events for [him] (Ex. 17F, page 12 [Tr. 1112]). However, as with the other entries and the [plaintiff]'s testimony, this suggests that [he] does not socially isolate himself and maintains friendships with others. Overall, this supports the conclusion that he could tolerate occasional interaction with the public.

Earlier entries document similar results, which supports the conclusion that the [plaintiff]'s mental health issues are stable with medication management and therapy. During a February 7, 2022, follow-up, [he] was described as appropriately dressed and groomed, fully alert, oriented, and cooperative. The entry stated, "He stated that he continues to get along well with his wife and from the psychosocial point of view, did not indicate any new stressors in his life" (Ex. 23F, page 26 [Tr. 1846]). Though [Dr. Auerbach] examined the [plaintiff] to evaluate his physical health, following a February 8, 2022, evaluation, Dr. Auerbach stated that the [plaintiff] exhibited a normal affect with no evidence of impaired judgment or significant memory impairment. The [plaintiff] was appropriate dressed and maintained good eye contact (Ex. 14F [Tr. 1083–90]).

The [plaintiff]'s course of treatment throughout 2022 documents similar results. A May 9, 2022, entry noted that upon examination, [he] exhibited good eye contact, appropriate dress, appropriate grooming, and normal psychomotor activity. [He] was described as very pleasant and cooperative. [His] memory was intact, with proper

> insight and judgment. [He] reported unpleasant dreams but denied psychosocial problems, mood swings, hallucinations, and homicidal or suicidal ideation. [He] was noted to exhibit no evidence of delusional thinking or obsessive-compulsive symptomatology. [He] stated he was not interested in additional psychopharmacological intervention and Dr. Torrellas described him as gradually improving in a very slow manner (Ex. 23F, pages 32-33 [Tr. 1852–53]). During an August 4, 2022, follow-up, Dr. Torrellas noted, "Up to this point he has chosen to manage his symptoms with psychotherapy and Prozosin rather than to consider any of the medications that are indicated for the diagnosis of PTSD." The entry again noted, "He is making good effort and is slowly but surely progressing[.]" (Ex. 23F, page 30 [Tr. 1850]). The [plaintiff]'s treatment in 2023 is consistent with Dr. Torrellas' conclusion that the [plaintiff] was making progress with his mental health issues.

Tr. 43–46 (emphases added).

The ALJ provided this assessment of a report by Dr. Kindelan:

> The undersigned has considered Dr. Kindelan's report (Ex. 15F [Tr. 1091–99]). Dr. Kindelan concluded that the [plaintiff] was unable to sustain a 40-hour work week within a competitive work environment. The question of disability is reserved to the Commissioner. However, Dr. Kindelan's conclusion is also inconsistent with the record. For example, during the course of the examination[,] the [plaintiff] stated he could drive, visit with neighbors, read, prepare simple meals, use a smartphone, and attend college courses. As to his presentation, the [plaintiff] was oriented, pleasant, cooperative, and adequately motivated. [He] was appropriately dressed, with neat and clean grooming. Overall, the [plaintiff]'s presentation supports the conclusion that he is able to act in a socially appropriate manner and is consistent with his presentation during treatment.
>
> The [plaintiff] was administered a Wechsler Adult Intelligence Scale … test, which measured his passive attention and concentration skills. [His] score on the examination was found to be in the high-average range. [He] exhibited an "excellent performance" in complet[ing] a "serial 7s" test and completing simple arithmetic. [His] memory was found to be in the average to above-average range. [He] was found to perform in a well-above average manner when asked to solve mental arithmetic word problems. [He] exhibited

> adequate expressive and receptive language skills. [His] common-sense and reasoning abilities were found to be excellent. [His] thoughts were organized, and his associations were direct. There was no indication of perceptual disturbances. According to Dr. Kindelan, the [plaintiff]'s intellectual abilities were found to be above average. Overall, the objective findings and the [plaintiff]'s performance during testing is inconsistent with Dr. Kindelan's opinion that the [plaintiff] is disabled. Given the findings in Dr. Kindelan's report, the undersigned finds Dr. Kindelan's opinion unpersuasive.

Tr. 46–47.

The ALJ provided this assessment of a March 2, 2021, statement from Tania Glenn, PsyD., LCSW:

> Dr. Glenn stated after visiting the [plaintiff] on March 24, 2019, "Mr. Stokes experienced good distancing from the triggers of the event as well as positive reframing as the outcome of his EMDR." However, Dr. Glenn also noted that [he] engaged in several risky behaviors during their meeting and exhibited a dangerous attitude. Dr. Glenn recommended the [plaintiff] therapy. Dr. Glenn stated that she continued to speak with [him] about his unhappiness with his employer and his options trying to salvage a relationship with his employer. Dr. Glenn does not include any opinion concerning workplace limitations and is unpersuasive for the conclusion that the [plaintiff] is more limited than found in the [RFC] assessment.

Tr. 47 (citing Tr. 947).

The ALJ provided this assessment of a June 1, 2023, statement by Dr. Collins:

> Dr. Collins stated that the [plaintiff]'s mental impairments result in marked or extreme limitations in his functioning. Dr. Collins stated that the [plaintiff] would be absent from work more than three times per month. Dr. Collins stated that the [plaintiff] exhibits a severe limitation in his ability to deal with work stress. Dr. Collins stated that the [plaintiff] would constantly experience symptoms severe enough to interfere with his ability to get along with and function with others cooperatively in a work setting.

> In contrast, Dr. Collins stated that the [plaintiff] has shown marked improvement in his symptoms with treatment. Dr. Collins also stated that the [plaintiff]'s prognosis was very good for marked improvement, that the [plaintiff]'s condition was not progressive and that she did not expect a worsening of symptoms. Dr. Collins stated that the [plaintiff]'s highest Global Assessment of Functioning (GAF) score for the year to date was 80. While the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V) no longer includes an Axis V dimension for diagnoses or the GAF score system, based on the DSM-IV, a GAF of 80 constitutes transient and expectable reactions to psychosocial stressors, or no more than slight impairment in social, occupational, or school functioning. The GAF score, the statement that the [plaintiff] has shown marked improvement with treatment and the conclusions concerning the [plaintiff]'s prognosis was very good are inconsistent with the severity of restrictions outlined in her opinion.
>
> The undersigned finds the severity of restrictions to be inconsistent with the [plaintiff]'s treatment history. For example, during the July 18, 2023, follow-up, the [plaintiff] reported he was compliant with treatment recommendations and doing well. [He] was calm, pleasant, and cooperative, with normal speech, attention, and concentrating ability, and a pleasant affect. [His] insight and judgment remained intact, as did his motor activity (Ex. 23F, pages 5-6 [Tr. 1825–26]). During the August 15, 2023, follow[-up], [he] was cooperative, calm, and pleasant, with fluent speech, intact insight, judgment, and thought processes, unremarkable thought content, intact motor activity, normal attention, average intelligence, and a normal ability to concentrate (Ex. 23F, pages 2-4 [Tr. 1822–24]). As previously noted, similar findings are detailed elsewhere in the record.
>
> The undersigned also finds Dr. Collins' opinions to be inconsistent with the [plaintiff]'s daily activities. The [plaintiff] stated that he is able to drive, travel, attend the gym, and attend college courses. Given the foregoing, the undersigned finds Dr. Collins' opinions inconsistent with the record and unpersuasive.

Tr. 47–48 (citing Tr. 1339–40).

The ALJ provided this assessment of an evaluation by Dr. Doyle:

> Dr. Doyle concluded that the [plaintiff] was totally disabled and not a suitable candidate for vocational rehabilitation. As stated earlier, the question of disability is reserved to the Commissioner. Overall, the undersigned finds Dr. Doyle's report unpersuasive in establishing additional limitations. For example, Dr. Doyle stated the [plaintiff] has not experienced any significant improvement. In contrast, during a July 18, 2023, follow-up, the [plaintiff] reported he was compliant with treatment recommendations and doing well. [He] reported that he continued to experience dreams, but they did not wake him (Ex. 23F, pages 5-6 [Tr. 1825–26]).
>
> Dr. Doyle stated the [plaintiff] was unable to maintain his attention and concentration for extended periods. In contrast, treatment entries detail the [plaintiff]'s attention and ability to concentrate as normal, which is consistent with the findings in his report (Ex. 23F [Tr. 1821–56] and 30F [Tr. 3669–724]). The [plaintiff]'s performance on an examination to measure his passive attention and concentration was average or above and Dr. Kindelan found the [plaintiff]'s ability to solve mental arithmetic to be well-above-average (Ex. 15F [Tr. 1091–99]). Dr. Kindelan found the [plaintiff] has marked limitations in relating appropriately with co-workers and supervisors, and the undersigned finds that to be inconsistent with the record, which documents the [plaintiff] as calm, cooperative, and pleasant. Further, Dr. Doyle stated that upon examination the [plaintiff] exhibited normal psychomotor activity, a normal attention span, normal concentration, and intact recent and remote memory. Dr. Doyle found the [plaintiff]'s intelligence was in the above-average range. Dr. Doyle stated that the [plaintiff]'s reasoning and judgment were not impaired, and his insight was good. The [plaintiff] exhibited no speech impediment, with a speech pattern that was logical, coherent and goal directed. Given the foregoing, the undersigned finds Dr. Doyle's opinions to be internally inconsistent with the findings in his report and the [plaintiff]'s treatment history, and unpersuasive in establishing additional limitations.

Tr. 48 (citing Tr. 1002–56).

The ALJ provided this assessment of the state agency determinations:

> As to the state agency assessments, in February 2022, Dr. Bruno found the [plaintiff] capable of two-step tasks, and semi-skilled tasks.

The [plaintiff] could follow directions and instructions and had no social restrictions (Ex. 1A [Tr. 140–147]). In her January 2023 assessment, Dr. Rowan found the [plaintiff] did not have a severe mental impairment (Ex. 3A [Tr. 149–55]). Dr. Rowan noted that mental status examinations and the [plaintiff]'s daily activities were within normal limits and demonstrated the [plaintiff] retained good functional abilities.

The state agency assessments are consistent with the undersigned's conclusion that the [plaintiff] does not have a disabling mental impairment. However, the [plaintiff] has a consistent treatment history, and the record is inconsistent with Dr. Rowan's opinion that the [plaintiff] does not have a severe mental impairment. Dr. Rowan's assessment is unpersuasive.

The undersigned agrees with Dr. Bruno that the [plaintiff] has a severe mental impairment. However, Dr. Bruno found the [plaintiff]'s primary limitation concerned his ability to concentrate, persist or maintain pace and that he has only a mild limitation in his ability to interact with others. This is inconsistent with the record and testimony. Examinations a [sic] February 7, 2023, follow-up, the [plaintiff] was anxious, with difficulty focusing. However, examinations document normal cognitive results. For example, upon examination in February 2023, the [plaintiff]'s thought content was unremarkable, with an intact thought process, memory, judgment, and insight, normal attention, and a normal ability to concentrate (Ex. 23F, page 24 [Tr. 1844]). During a July 18, 2023, follow-up, [he] exhibited normal speech, attention, and concentrating ability. [His] insight and judgment remained intact, as did his motor activity (Ex. 23F, pages 5-6 [Tr. 1825–26]). An August 15, 2023, entry the [plaintiff] was cooperative, calm, and pleasant, with fluent speech, intact insight, judgment, and thought processes, unremarkable thought content, intact motor activity, normal attention, average intelligence, and a normal ability to concentrate (Ex. 23F, pages 2-4 [Tr. 1822–24]).

As recently as December 2024, the [plaintiff] exhibited normal attention and concentrating ability. [He] exhibited no abnormalities in his perception or cognition. [His] insight and judgment were intact. [His] thought content was unremarkable, and his thought content was intact (Ex. 30F, page 55 [Tr. 3723]). These results do not suggest any significant impairment in the [plaintiff]'s ability to concentrate, persist or maintain pace. Further, [he] reported or testified that he is able to drive, attend the gym, and attend classes. Given this, the undersigned finds this portion of Dr. Bruno's

> assessment inconsistent with the record and unpersuasive. The [plaintiff] is not limited to semi-skilled tasks and does not have a moderate limitation in his ability to concentrate, persist or maintain pace.

Tr. 48–49.

The ALJ provided this assessment of a February 23, 2021, statement from Envision Physician Services:

> The [plaintiff] is to avoid excessive standing, sitting, squatting, stooping, laying on his abdomen, sparing, and direct physical contact. The statement is vague as it does not provide any specifics concerning what would constitute "excessive." Further, the record includes years of additional treatment and objective results that were not available at the time this statement was provided. Given this, the opinion is unpersuasive for establishing the existence of additional limitations that would preclude a reduced range of light work in accordance with the [RFC] assessment.

Tr. 49 (citing Tr. 946).

The ALJ provided this assessment of a February 8, 2022, consultative examination report by Dr. Auerbach:

> Dr. Auerbach stated that **the [plaintiff] exhibited no limitation for** sitting, **standing,** lifting, carrying, pushing, pulling, and fine motor activity. **The [plaintiff] exhibited a mild limitation for walking** and a moderate limitation for climbing steps, bending, and kneeling.
>
> The undersigned finds Dr. Auerbach's conclusions concerning the [plaintiff]'s ability to walk, sit, stand, lift, carry, push, pull, [and] complete fine motor activities to be consistent with the objective findings in his report. **For example, as to [the plaintiff's] abdomen, it was soft and non-tender, with normal bowel sounds, and no evidence of bruits, masses, or hepatosplenomegaly. The [plaintiff] retained full strength in his upper and lower extremities. [He] retained full grip strength, and his hand and finger dexterity were intact. [He] exhibited no edema, trophic changes, varicosities, or muscle**

**atrophy in his extremities, and his joints were stable and non-tender. [His] spine was normal, and straight leg raising results were negative**.

As to [the plaintiff's] range of motion, he exhibited some degree of limitation in forward flexion of the lumbar spine, and in his hip flexion, abduction, adduction, and rotation. However, [he] retained a normal range of motion with extension and lateral flexion of the lumbar spine, along with full hip extension, and retained a full range of motion in his cervical spine, shoulders, elbows, wrists, hands, knees, ankles, and toes. [He] is limited to work that requires only occasional bending, stooping, [climbing] stairs, kneeling, and reaching above shoulder level. Dr. Auerbach's findings concerning the [plaintiff]'s range of motion does not suggest the presence of additional limitations, or that the [plaintiff]'s ability to climb stairs, bend, and kneel would preclude occasional bending, kneeling, or climbing stairs.

As to the [plaintiff]'s ability to ambulate, Dr. Auerbach stated, "Used a cane prescribed for weightbearing and balance and, in my opinion, is needed." In contrast, Dr. Le reviewed the record in February 2022 and opined that it was not consistent with normal examinations of the [plaintiff], including intact neurovascular findings, and the [plaintiff]'s normal physical activities. Dr. Le further noted that the [plaintiff] was noted to walk without assistance as early as August 2019 (Ex. 1A, page 6 [Tr. 145]). Dr. Smith reviewed the record in January 2023 and included a similar statement in his assessment (Ex. 3A [Tr. 149–55]). The undersigned finds the state agency opinions concerning the [plaintiff]'s need for a cane to be more consistent with the record. For example, the [plaintiff] is noted to attend the gym, drive, and use a rowing machine. Following a February 2023, examination, [he] exhibited no tenderness or deformity in his musculoskeletal system. [He] exhibited a normal range of motion and exhibited no erythema or warmth in his feet (Ex. 17F, pages 12-13 [Tr. 1112–13]). A March 2023 entry noted [his] gait was antalgic but also that he did not require use of an assistive device (Ex. 17F, pages 9-11 [Tr. 1109–11]). A July 26, 2023, entry noted that upon examination [he] exhibited a strong and steady gait (Ex. 26F, page 298 [Tr. 2161]).

As to more recent entries, a January 30, 2024, entry noted that upon examination the [plaintiff] was not using a gait aid. [He] was also noted to have resumed driving after his surgery. [He] could climb stairs normally and had returned to the gym. Upon examination, [he] exhibited a satisfactory gait pattern. [He] exhibited an active range

> of motion in the supine position to 125 degrees with a strong straight leg raise and satisfactory patellar tracking (Ex. 26F, page 81 [Tr. 1944]). A March 1, 2024, entry noted [he] reported a good recovery from his surgery. At that time, [he] reported he exercised daily for one hour per day. Upon examination, [he] exhibited normal coordination, a supple neck, and a normal range of motion in his musculoskeletal system, with no evidence of tenderness or deformity. [His] feet exhibited no erythema or warmth. [He] exhibited a normal appearance and was in no acute distress (Ex. 26F, pages 67-69 [Tr. 1930–32]). Given the foregoing, the undersigned finds Dr. Auerbach's opinion concerning the [plaintiff]'s need for a cane to be inconsistent with the record and unpersuasive.

Tr. 49–51 (emphases added) (citing Tr. 1083–90).

The ALJ provided this assessment of Dr. Le's findings:

> In February 2022, Dr. Le found the [plaintiff] capable of a reduced range of lifting and carrying up to 20 pounds on an occasional basis and 10 pounds on a frequent basis. Dr. Le found the [plaintiff] could sit for six hours during an eight-hour workday (Ex. 1A [Tr. 140–47]). The [plaintiff] could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, and occasionally balance and climb ladders, ropes, and scaffolds. Dr. Le found the [plaintiff] has no manipulative, visual, communicative, or environmental limitations. In his January 2023 assessment, Dr. Smith agreed with Dr. Le's initial assessment (Ex. 3A [Tr. 149–55]). The undersigned finds their opinions concerning the [plaintiff]'s ability to perform light work to be consistent with the record and persuasive. Given the [plaintiff]'s complaints of pain, including abdominal pain, the undersigned has limited [him] to light work. However, in accounting for [his] various symptoms, including his knee and abdominal pain, the undersigned finds that he has developed additional postural limitations and must avoid work around unprotected heights.

Tr. 51.

The ALJ observed that the Appeals Council noted that the state agency assessments found that the plaintiff could stand, walk, or both for only two

hours during the course of an eight-hour workday, and he explained why the record did not support the limitation:

> For example, a January 30, 2024, entry noted that the [plaintiff] was not using gait aids. The entry also noted [he] could drive, climb stairs normally, and returned to the gym. [He] exhibited a satisfactory gait pattern (Ex. 26F, page 81 [Tr. 1944]). A February 21, 2024, entry noted that [he] exhibited gross muscle strength and flexibility that were within functional limits (Ex. 27F, page 71 [Tr. 2251]). The March 1, 2024, entry noted [he] reported a good recovery from his surgery. [He] reported some residual swelling but improving discomfort. At that time, [he] reported he exercised daily for one hour per day. Upon examination, [he] exhibited normal coordination, a supple neck, and a normal range of motion in his musculoskeletal system, with no evidence of tenderness or deformity. [His] feet exhibited no erythema or warmth (Ex. 26F, pages 67-69 [Tr. 1930–32]). An April 2, 2024, entry described [his] gait as slow, but did not note use of an assistive device and [he] was found to exhibit normal lower extremity strength (Ex. 26F, page 42 [Tr. 1905]). Further, at the December 11, 2024, hearing, [he] reported that he still attended the gym and is able to ride a motorcycle that he estimated weighs 300 pounds. Overall, the objective findings previous[ly] detailed support the conclusion that the [plaintiff] is able to stand and walk for more than two hours per day and the undersigned finds this portion of the state agency assessments to be unpersuasive.

Tr. 51.

The ALJ provided this assessment of additional state agency consultant determinations:

> The consultants noted that Dr. Auerbach's conclusion [sic] that a cane was needed. However, Drs. Le and Smith found this was not consistent with normal examinations, including intact neurovascular findings. Drs. Le and Smith also found it to be inconsistent with an August 2019 entry that detailed the [plaintiff] walking without use of an assistive device. The undersigned finds this portion of their assessments to be supported by the record and persuasive. The [plaintiff] did require use of a cane in December 2023, but this was two weeks after a total knee arthroplasty (Ex. 26F, page 86 [Tr. 1949]). The January and April 2024 entries support the conclusion

> that the [plaintiff]'s condition improved following treatment and that he does not require use of an assistive device.

Tr. 51.

The ALJ explained that he had considered the combined effects of the plaintiff's impairments. Tr. 52. The ALJ provided this explanation:

> The [plaintiff] was injured during a violent attack. However, treatment records document [he] has responded positively to treatment. This is consistent with his ability to attend college, attend CrossFit classes, and travel in a large recreational vehicle. Given this, the record supports the conclusion that [he] is capable of a reduced range of light work that requires no more than occasional interaction with the general public.

Tr. 52.

The ALJ found that the plaintiff could not perform his past relevant work, which the ALJ categorized as an enforcement officer and a recruiting instructor. Tr. 52. The ALJ observed that the plaintiff was 46 years old on the alleged onset date and has at least a high school education. Tr. 52–53. The ALJ found that, considering the plaintiff's age, education, work experience, and RFC, he could still do jobs that exist in significant numbers in the national economy. Tr. 53. The ALJ gave examples of a routing clerk (light), a courier (light), a cafeteria attendant (light), a monitor (sedentary), an addressing clerk (sedentary), and a film touchup inspector (sedentary). Tr. 53–54. The ALJ thus found the plaintiff not disabled. Tr. 55.

The Appeals Council denied the plaintiff's request for review. Tr. 9–14, 330–32. This action followed.

## III. First Argument

The plaintiff argues that the ALJ reversibly erred by rejecting Dr. Le's and Dr. Smith's opinion that he could stand, walk, or both for only two hours during an eight-hour workday. Doc. 9 at 2, 11, 13–20.

Contrary to the plaintiff's argument, the ALJ supported with substantial evidence—i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *see Richardson*, 402 U.S. at 401 (quoted)—his finding that Dr. Le's and Dr. Smith's opinion that the plaintiff could stand, walk, or both for only two hours during an eight-hour workday was unpersuasive. The substantial evidence runs throughout the ALJ's opinion, read as a whole. The evidence, as summarized by the ALJ, includes evidence that the plaintiff needs to change positions, which the ALJ accounted for in the RFC (the plaintiff is limited to work that allows him to change position at least once an hour for one or two minutes, Tr. 33), that the plaintiff has difficulty bending, stooping, climbing stairs, or kneeling, which the ALJ accounted for in the RFC (the plaintiff can only occasionally bend, stoop, climb stairs, and kneel, Tr. 33), and that the plaintiff has other physical limitations, which the ALJ accounted for in the RFC (the plaintiff cannot crouch; crawl; climb ladders, ropes, or scaffolds; or work around unprotected heights, Tr. 33).[*]

The plaintiff makes four specific arguments.

---

[*]To avoid the possibility of factfinding on numbers, the court declines to address the Commissioner's argument that even if the plaintiff could only stand, walk, or both for only two hours in an eight-hour workday, a finding of no disability would still be appropriate because the ALJ found that the plaintiff could perform several sedentary jobs. *See* Doc. 11 at 8–9.

First, the plaintiff argues that Dr. Le's and Dr. Smith's opinion relates to the time period between the alleged onset date (March 1, 2021, Tr. 336), and the day of their opinion (February 12, 2022 (Dr. Le), Tr. 145, and January 26, 2023 (Dr. Smith), Tr. 154), while the ALJ cited evidence beginning in 2024, Tr. 51. Doc. 9 at 16. The argument is unpersuasive because it considers only a small part of the ALJ's decision, not the decision as a whole, which detailed the plaintiff's entire medical history, beginning with the gunshots.

Second, the plaintiff argues that the ALJ "misinterpreted the nature of the physical examination findings." Doc. 9 at 16–17. According to the plaintiff, "the ALJ has cited to no medical evidence whatsoever that would support his theory that [the plaintiff] could stand and/or walk six hours per day despite his pain symptoms." Doc. 9 at 17. The evidence bolded above refutes this argument.

Third, the plaintiff argues that the daily activities on which the ALJ relied are not inconsistent with Dr. Le's and Dr. Smith's opinion. Doc. 9 at 17. The plaintiff observes that "[t]here are many seated activities available at a gym and attending a gym does not necessarily require any degree of standing and/or walking ability," and riding a motorcycle is "entirely irrelevant" to his ability to stand or walk for an extended period of time. Doc. 9 at 17–18. The argument lacks merit. The plaintiff did not testify that his workouts consist of seated activities only (he does bodyweight squats, *see* Tr. 39), and the ALJ could reasonably conclude that someone who has consistently participated in CrossFit for more than a decade and rides a heavy motorcycle, requiring standing at stops, can perform light work with several limitations, including an option to shift positions every hour.

Fourth, the plaintiff argues that "the medical evidence viewed in totality supports" Dr. Le's and Dr. Smith's opinion. Doc. 9 at 18–19. As the language excerpted above makes clear, the ALJ described the evidence and explained the bases for his findings, including his RFC finding. No law required the ALJ to describe every piece of evidence or to uncritically rely on every piece of evidence that could support a disability finding. And rather than "play doctor," the ALJ evaluated the evidence and, in accord with his responsibility, found the RFC. *See* 20 C.F.R. § 404.1546(c).

Remand on this issue is unwarranted.

## IV. Second Argument

The plaintiff argues that the RFC is not supported by substantial evidence because it lacks limitations relating to his hearing loss, obesity, or sleep apnea. Doc. 9 at 1, 9, 20–22.

The ALJ expressly stated that he had considered all medically determinable impairments, whether or not severe, when determining the RFC. *See* Tr. 30. The ALJ explained that, to account for the plaintiff's "various symptoms," he included in the RFC postural limitations and a requirement that he avoid working around unprotected heights. Tr. 51. The ALJ adequately explained why he excluded a limitation relating to hearing loss (the plaintiff could participate in medical appointments through telehealth without issue, his mental status exams showed no symptoms relating to tinnitus, and he had normal speech, Tr. 28). The ALJ adequately explained why he excluded a limitation specific to obesity (Dr. Le and Dr. Smith did not include obesity as an impairment, and normal examination findings evidenced the need for nothing more than minimal limitations and supported the conclusion that

obesity did not impose stress on weight-bearing joints that would result in exertional or postural limitations, Tr. 28–29). The ALJ adequately explained why he excluded a limitation specific to sleep apnea (the plaintiff uses a CPAP machine that has improved his breathing and sleeping, and he has normal mental status examination findings, indicating his sleep is not impacting his cognitive functioning, Tr. 29). Substantial evidence, excerpted above, supports the findings. *See* Tr. 28–52.

The plaintiff argues that the ALJ failed to consider his "obesity, degenerative disc disease, and hip arthritis in combination, since degenerative disc disease and hip arthritis are not even mentioned as impairments in the decision," though the plaintiff acknowledges the ALJ's reference to "arthropathies." Doc. 9 at 22. To the contrary, as the language excerpted above makes clear, as well as the ALJ's express statement, the ALJ considered all of the plaintiff's impairments in combination in assessing the RFC. *See* Tr. 30. Moreover, the ALJ considered the medical records on which the plaintiff relies for this argument. *See* Tr. 41 (summarizing the results of the April 2019 hip CT, August 2019 knee x-rays, and April 2024 hip x-rays); Tr. 42 (summarizing images of the plaintiff's knee).

The plaintiff argues that his untreated or undertreated sleep apnea "causes fatigue, daytime somnolence, and cognitive difficulties that would reasonably affect [his] ability to sustain concentration, persistence, and pace throughout an eight-hour workday," particularly when combined with his PTSD-related sleep disturbance. Doc. 9 at 23. He complains that the ALJ included "no limitations to account for this issue in the RFC" and failed to adequately explain "why such limitations were excluded." Doc. 9 at 23. As discussed above, the ALJ adequately explained why he excluded a limitation

specific to sleep apnea. Tr. 29. And the decision makes clear that the ALJ excluded the limitations suggested by the plaintiff based on the ALJ's consideration of the entire record, as evidenced by his discussion of the plaintiff's sleep patterns (including improved sleep and an average of approximately seven to eight hours of sleep per night, Tr. 36, 44) and the normal findings in the plaintiff's ability to concentrate, and his explanation of why the record supports that the plaintiff does not have a moderate limitation in concentrating, persisting, or maintaining pace. Tr. 44–45, 48–49.

Remand on this issue is unwarranted.

## V. Conclusion

The Commissioner's final decision is **affirmed**. The clerk is **directed** to enter judgment for the Commissioner of Social Security and against Anthony Stokes and close the file.

**Ordered** in Jacksonville, Florida, on September 22, 2026.

Patricia D. Barksdale
*United States Magistrate Judge*